IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| ROSETTA GENOMICS, INC. | Case No. 18-11316 (LSS) |
| Debtor. | Jointly Administered |
| DON A. BESKRONE, not individually, but solely as Chapter 7 trustee for ROSETTA GENOMICS, INC., | |
| Plaintiff, | Adv. Pro. No. 23-50336 (LSS) |
| v. | |
| Kenneth A. Berlin, Ron Kalfus, and Brian Markison, | |
| Defendants. | |

## MEMORANDUM

Before the Court is the Motion[1] filed by Kenneth Berlin, Ron Kalfus and Brian Markison (each a "Defendant" and collectively, "Defendants") to dismiss the Complaint[2] filed by Don Beskrone ("Plaintiff") in his capacity as chapter 7 trustee for Rosetta Genomics, Inc. ("Debtor").

Defendants argue that the Complaint should be dismissed pursuant to Federal Rules of Civil Procedure ("Civil Rules") 12(b)(2), 12(b)(6), the doctrine of *forum non conveniens* and Delaware's statute of limitations.[3] Defendants also request that this Court withdraw the

---

[1] Defs.' Mot. to Dismiss Compl., Dkt. No. 23 ("Motion").

[2] Compl. for Damages, Dkt. No. 1 ("Complaint").

[3] Motion; Mem. Law Supporting Defs.' Mot. Dismiss Compl. 8, Dkt. No. 24 ("Opening Br.").

District Court's reference to this Court. Finally, Defendants seek to dismiss the Complaint for failure to state a claim. For the reasons discussed below, with a single exception, the Motion is denied.

FACTUAL BACKGROUND[4]

The Debtor was a Delaware corporation with its principal place of business in Pennsylvania. Rosetta Genomics, Ltd. ("Parent") was an Israeli company that formed Debtor as a wholly owned subsidiary to commercialize and expand its business in the United States. Defendants in this action are former directors and officers of Debtor and Parent. Berlin served as the CEO of Parent and as the sole director of Debtor. Kalfus served as the CFO of both Parent and Debtor. Markison served as the Chairman of Parent's board of directors. Each Defendant is a citizen of New Jersey.

Parent "develop[ed] and commercialize[d] new diagnostic tests based on various genomics markers, including DNA, mircoRNA and protein biomarkers and using various technologies, including qPCR, microarrays, Next Generation Sequencing (NGS) and Fluorescence In Situ Hybridizaton (FISH)."[5] Debtor commercialized Parent's products and performed tests in its laboratories to expand Parent's business in the United States. Debtor's most significant assets were its subsidiaries, Minuet Diagnostics, Inc. and CynoGen, Inc., as well as the diagnostic test RosettaGX Reveal ("Reveal"). Reveal accounted for 75%-85% of Debtor's revenue.

---

[4] As required when considering a motion to dismiss, the facts recited herein are taken from the Complaint. *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

[5] Complaint ¶ 43.

Parent also owned another diagnostic test, RosettaGX Cancer Origin Test ("Cancer Origin"). In 2012, Medicare established a reimbursement rate for Cancer Origin and published a formalized coverage decision through a Local Coverage Determination ("LCD"). This LCD meant that Debtor and/or Parent received approved, automatic payments for claims submitted to Medicare and private insurers for Cancer Origin.

There was no LCD for the Reveal test. If the Reveal test was correctly coded, it was rarely reimbursed. But, it was often billed under the coding for Cancer Origin such that reimbursement was "automatic."[6] Prior to 2017, miscoded Reveal tests were reimbursed by Medicare in 90% of cases. By February 2018, after the miscoding was discovered, Medicare reimbursement rates plummeted to less than 5%. Defendants knew of the false coding no later than mid-June 2017. Internal documents reveal that Berlin sent a message to Debtor's general counsel stating that the false coding had been present "from Day One."[7]

### A. PUBLIC FILINGS AND THE SECURITIES PURCHASE AGREEMENTS.

On September 26, 2016, Parent filed its Form 6-K, which included its June 30, 2016 unaudited financial statements. The form 6-K was signed by Kalfus. Parent reported revenues on Reveal tests, but did not disclose that Reveal tests were being billed as Cancer Origin.

Parent entered into a Securities Purchase Agreement in November 2016 (the "2016 SPA") with Sabby Healthcare Master Fund, Ltd. and Sabby Volatility Warrant Master Fund, Ltd. (collectively, "Sabby"). Pursuant to the 2016 SPA, Sabby tendered $3,160,000 to Parent and received 1,095,000 ordinary shares and other warrants in exchange. This

---

[6] Complaint ¶ 45.

[7] Complaint ¶ 45.

agreement was executed by Berlin, who made numerous statements regarding Parent's revenues, assets and liabilities.  Berlin did not disclose the miscoding.

The 2016 SPA, a direct placement subject to Parent's then-current Registration Statement, incorporated the 2016 Form 6-K, the Prospectus and the Prospectus Supplement. The 6-K and the 2016 SPA contain warranties that the incorporated financial statements complied with Generally Accepted Accounting Principles (GAAP) and "fairly present in all material respects the financial position of [Parent] and its consolidated subsidiaries as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited financial statements, to normal, immaterial, year-end audit adjustments."[8] These documents did not disclose that Reveal's high reimbursement rate and revenue were due to the false coding.  Parent acknowledged that Sabby was relying on its representations in entering into the 2016 SPA.

Debtor provided an absolute guaranty of the 2016 SPA.  It also adopted Parent's representations and warranties as they related to Debtor.  Debtor did not disclose that Reveal revenues and reimbursement rates were based on false coding or that if discovered, this could lead to a material decline in reimbursement rates.

On March 30, 2017, Parent filed its 20-F, which included consolidated financial statements; this filing was certified by each of the Defendants.

In June 2017, Defendants learned that the false coding of Reveal was under scrutiny by Medicare.  In response, Defendants "purported" to launch an internal investigation and "purported" to "fix" the miscoding.[9]  Notwithstanding the internal acknowledgement of the

---

[8] Complaint ¶ 52.

[9] Complaint ¶ 63.

miscoding, Defendants repeatedly appealed the denial of reimbursement. Further, the economic impact on revenues was immediate.

On August 3, 2017, Parent and Sabby entered into a second Securities Purchase Agreement ("August 2017 SPA") for the purchase of ordinary shares and warrants. Berlin signed the August 2017 SPA, but he made no disclosures about Reveal.

On September 28, 2017, Parent and Sabby entered into a third Securities Purchase Agreement ("September 2017 SPA") by which Sabby agreed to purchase unregistered convertible debentures and warrants to purchase ordinary shares. Berlin signed the September 2017 SPA. There were no disclosures about Reveal.

The terms of the August 2017 SPA and the September 2017 SPA were materially identical to those in the 2016 SPA, including the incorporation of the Registration Statement. The August 2017 SPA and the September 2017 SPA were guaranteed by Debtor with terms materially identical to Debtor's guarantee of the 2016 SPA. Debtor made no disclosures about Reveal.

In deciding to enter the August 2017 SPA and the September 2017 SPA, Sabby relied on financial statements, registration statements, public statements and other representations and warranties regarding Parent's and Debtor's business. Defendants always knew that Reveal coding was false and that this could have a material impact on its reimbursement rates. In total, Sabby tendered $7,871,844 to Parent under the three SPAs.

On October 10, 2017, Parent filed its Form 6-K with the SEC. In that disclosure, Berlin reported that Reveal revenues in the third quarter of 2017 increased by 23% compared to the previous quarter. Berlin also represented that Reveal "has significant near- and long-term revenue prospects with relatively high gross margins, which is why we believe

Reveal provides the best path to profitability."[10]  Reveal was a material portion of Parent's revenue, accounting for 80% of its revenue for the second quarter and 75% of its total gross revenue for the first half of 2017.  In connection with the Form 6-K, Parent announced that it was suspending its previous revenue and unit guidance, with the intention to update such guidance.  Nevertheless, Parent issued the prior guidance knowing that Reveal was being miscoded and that it presented a material risk to existing revenue and forward-looking statements.

Berlin ignored reasonably available data which would have made clear that his statements on Parent's performance were not warranted.  Defendants reported higher incomes in the third quarter by recognizing 100% of third-quarter Medicare claims as revenue despite Defendants' knowledge that the proper reimbursement rate approached 0%.  These actions violated GAAP rules such that Parent's accountant later refused to explain the accounting.

### B. THE MERGER AGREEMENT WITH GENOPTIX.

On December 14, 2017, Parent entered into an Agreement and Plan of Merger ("Merger Agreement") with Genoptix, Inc. ("Genoptix").  By the Merger Agreement, Genoptix was to acquire both Parent and Debtor.  Defendants never disclosed the miscoding of Reveal tests, the internal investigation or the declines of revenue and Medicare reimbursement rates.

Parent held an Extraordinary General Meeting of Shareholders on February 22, 2018 to obtain approval of the proposed merger.  The merger was not approved.  That same day,

---

[10] Complaint ¶ 74.

Genoptix terminated the Merger Agreement and entered into a new Agreement and Plan of Merger ("New Merger Agreement"). The material terms remained the same except for changes to the purchase price and the closing date.

Markison approved the Merger Agreement and the New Merger Agreement; the Agreements state:

> WHEREAS, the board of directors of the Company (the "Company Board") has unanimously (i) determined that this Agreement, the Merger and the other transactions contemplated by this Agreement are fair to, and in the best interests of, the Company and its shareholders and that, considering the financial position of the merging companies, no reasonable concern exists that the Surviving Company, will be unable to fulfill the obligations of the Company to its creditors; (ii) approve this Agreement, the Merger and the other transactions contemplated hereby; and (iii) determined to recommend that the shareholders of the Company approve this Agreement, the Merger and the other transactions contemplated hereby[.][11]

Berlin executed the Merger Agreements.

As an inducement to (and a condition of) Genoptix's willingness to enter into the New Merger Agreement, Debtor agreed to sell its subsidiary—Minuet Diagnostics, Inc. (and Minuet's subsidiary, CynoGen, Inc.)—to Genoptix outside the context of the merger transaction (i.e., not conditioned on closing). The relevant documents were executed by Berlin. As a further inducement, Debtor also entered into a Loan and Security Agreement by which Genoptix extended Debtor a bridge loan of up to $600,000 monthly, with simple interest of 10% per annum. The Loan and Security Agreement was secured by the capital stock of the Debtor and its subsidiaries. The loan was not contingent on the closing of the merger.

---

[11] Complaint ¶ 83.

At the time the various agreements were entered into, Berlin and Kalfus beneficially owned 45,318 and 2,838 shares of Parent, respectively. Given the financial condition of both Parent and Debtor, the completion of the merger was the only way to save the companies and for Berlin and Kalfus not to lose all value in their shares.

To ensure sufficient votes in support of the merger, Berlin solicited Sabby to purchase additional shares on the open market. In soliciting Sabby's further investment, Berlin never disclosed any issues surrounding Reveal. Sabby purchased additional shares in reliance on Berlin's solicitation.

The New Merger Agreement was amended on March 11, 2018 and executed by Berlin. The New Merger Agreement was subsequently amended again, with this amendment executed by Kalfus.

On April 26, 2018, Parent held another Extraordinary General Meeting of Shareholders to obtain approval of the proposed merger with Genoptix. With Sabby's additional shares, the proposed merger obtained sufficient shareholder approval. Meanwhile, Genoptix began performing its due diligence of Parent and Debtor. The Merger Agreement and the New Merger Agreement each contained various representations regarding the state of Parent's business, the veracity of previous business statements and filings and the nonexistence of anything that would materially damage the business. Berlin and Kalfus approved and caused Parent to make the representations.

On May 22, 2018, Genoptix first identified Parent's material misrepresentations. Three days later, Genoptix provided a detailed explanation of the breached representations and warranties which mostly related to Reveal. On May 29, 2018, Genoptix alleged that it had discovered documentation of hundreds of Reveal tests being miscoded; Genoptix

8

subsequently exercised its right under the New Merger Agreement to withdraw from the transaction.

PROCEDURAL BACKGROUND

On May 31, 2018, Debtor filed for relief under chapter 7. A meeting of creditors was held on July 18, 2018, after which Plaintiff became the permanent trustee for Debtor pursuant to 11 U.S.C. § 702(d).

Also on May 31, 2018, Parent commenced liquidation proceedings in Israel, pursuant to which an Israeli Liquidator was appointed.

On May 27, 2021, this Court entered an Order authorizing Plaintiff to enter into an assignment agreement with Sabby under which Sabby assigned its direct claims against Defendants to Plaintiff.[12] In early February 2022, both this Court and the Israeli court approved an agreement by which Parent's direct claims against Defendants were assigned to Plaintiff.[13]

Plaintiff filed a complaint against Defendants and others in the United States District Court for the Southern District of New York on May 28, 2021 ("SDNY Lawsuit"), which was subsequently amended to include the claims assigned to Plaintiff by the Israeli Liquidator. On February 15, 2023, the court dismissed the SDNY Lawsuit for lack of

---

[12] Ord. Approving Motion of Don A. Beskrone, Chapter 7 Tr., to Authorize Entry into Agreement to Take Assignment of and Prosecute Direct Claims of Sabby Entities *Nunc Pro Tunc* to May 14, 2021, and for Related Relief, *In re Rosetta Genomics, Inc.*, No. 18-11316 (Bankr. D. Del. May 27, 2021), Dkt. No. 145.

[13] Ord. Approving Motion of Don A. Beskrone, Chapter 7 Tr., to Authorize Entry into Agreement to Take Assignment of and Prosecute Direct Claims of Rosetta Genomics, Ltd. Held by Israeli Liquidator and for Related Relief, *In re Rosetta Genomics, Inc.*, No. 18-11316 (Bankr. D. Del. Feb. 2, 2022), Dkt. No. 157.

personal jurisdiction without prejudice to Plaintiff's right to pursue the claims in a proper forum.[14]

On April 14, 2023, Plaintiff filed the Complaint, which sounds in seven counts, as follows:

| Count | Origin of Claim | | Defendants | Capacity |
|-------|-----------------|-----------------|------------|----------|
| I | Breach of Fiduciary Duty | Debtor | Berlin | Director, Debtor |
| | | Sabby | Kalfus | CFO, Debtor |
| II | Gross Negligence | Debtor | Berlin | Director, Debtor |
| | | Sabby | Kalfus | CFO, Debtor |
| III | Breach of Fiduciary Duty | Parent | Berlin | CEO/President, Parent |
| | | | Kalfus | CFO, Parent |
| | | | Markison | Chair of Board, Parent |
| IV | Gross Negligence | Parent | All Defendants | Officers/Directors of Parent |
| V | Fraud | Debtor | All Defendants | Officers/Directors of Debtor |
| VI | Fraud | Parent | All Defendants | Officers/Directors of Parent |
| VII | Negligent Misrepresentation | Parent | All Defendants | Officers/Directors of Parent |

Defendants moved to dismiss on multiple grounds: (i) lack of subject matter jurisdiction, (ii) lack of personal jurisdiction, (iii) *forum non conveniens*, (iv) statute of limitations and (v) failure to state a claim. With their Motion, Defendants filed the Declaration of Aurora

---

[14] *Beskrone v. Berlin*, 656 F. Supp.3d 496 (S.D.N.Y. 2023).

Cassirer in Support of Motion to Dismiss.[15]  Plaintiff filed his answering brief.[16]  Defendants

filed their reply.[17]  This matter is ripe for decision.

JURISDICTION

     *A. SUBJECT MATTER JURISDICTION EXISTS OVER THIS ADVERSARY PROCEEDING.*

     Plaintiff asserts the Complaint is related to Debtor's bankruptcy case so the Court

has subject matter jurisdiction under 28 U.S.C. § 1334.

     Defendants do not quite come out and say the Court does not have subject matter

jurisdiction.  Instead, they argue that "[i]n this situation, there is less reason for the Court to

find this proceeding is 'related to' the Rosetta, Inc. bankruptcy."[18]  This "situation" is the

assignment of claims by Sabby and Parent and the agreed split of recoveries.  Under

Plaintiff's agreement with Sabby, any recoveries on the Sabby-assigned claims first cover

litigation fees and then are split 85% to Sabby and 15% to Debtor's estate.  Under Plaintiff's

agreement with Parent, any recoveries on the Parent-assigned claims first cover litigation

fees and then are split 50% to Sabby and 50% to Debtor's estate.  Further, from the estate's

share of recoveries on any claims, Plaintiff must pay 33.3% to the Israeli Liquidator.  Based

---

[15] Decl. Aurora Cassirer Supp. Mot. to Dismiss, Dkt. No. 25.  While a court can review certain types of documents on a motion to dismiss, here I will not do so.  Defendants ask me to "consider" all public filings attached to the Cassirer Declaration as well as all public documents in the SDNY Lawsuit.  But aside from citing to one Court of Chancery decision (and no federal decision), Defendants do not cite relevant authority regarding how these documents should be considered or for what purpose.  Further, they only intermittently cite to the Cassirer Declaration without guiding me as to what inferences I should draw from it that support the Motion.

[16] Pl.'s Mem. Law Opp'n Defs.' Mot. to Dismiss Compl., Dkt. No. 26 ("Answering Br.").

[17] Reply Mem. Law Further Supp. Defs.' Mot. to Dismiss Compl., Dkt. No. 27 ("Reply Br.").

[18] Opening Br. 10.

on this arrangement, Defendants contend that "a substantial amount" of any recoveries will not redound to the estate.

It is well settled in the Third Circuit that "related to" jurisdiction exists where "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy."[19] If the outcome of the proceeding could alter the debtor's estate, there is jurisdiction; "certainty, or even likelihood, is not a requirement."[20] Conceivability is the focal point of the analysis.[21] Defendants do not cite to any case for the proposition that bankruptcy jurisdiction is grounded in the amount of recovery that may be realized in pursuing a cause of action. Such a conclusion flies in the face of *Pacor*'s capacious language. Thus, even assuming Defendants are correct that Sabby and the Israeli Liquidator will receive a significant portion of any net proceeds,[22] because the outcome of this proceeding *could* result in money flowing into Debtor's estate, this proceeding is "related to" a case under title 11. Subject matter jurisdiction exists.

But, this is a non-core proceeding. Accordingly, I cannot issue final orders unless the parties consent. While Plaintiff does, Defendants do not. Ultimately, then, I will need to issue findings of fact and conclusions of law to the district court.[23]

---

[19] *Superior Contracting Grp. Inc. v. Rachmale (In re LTC Holdings, Inc.)*, 587 B.R. 25, 36 (Bankr. D. Del. 2018) (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1995).

[20] *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 164 (3d Cir. 2004) (quoting *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 264 (3d Cir. 1991)).

[21] *Nuveen Mun. Tr. ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.*, 693 F.3d 283, 294 (3d Cir. 2012).

[22] Defendants do not provide any hypothetical examples of recoveries, but as is clear from the sharing agreements, the estate's recoveries will depend on which counts, if any, are winners.

[23] This is not a final decision.

### B. THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS.

Plaintiff asserts in the Complaint that the Court has personal jurisdiction over

Defendants,

> each of whom are United States citizens, are officers and/or directors of a Delaware corporation (or its parent) and the claims against them involve their actions undertaken in the United States in their official capacities as officers and/or directors.[24]

Relying on § 3114 of Title 10 the Delaware Code ("Service of Process on nonresident

directors, trustees, members of the governing body or officers of Delaware corporations")

and § 278 of Title 8 ("Continuation of corporation after dissolution for purposes of suit and

winding up affairs"), Defendants argue that Delaware law cannot be used to establish

personal jurisdiction because the Complaint was filed more than three years after "the date

of the corporation's expiration."[25]  Defendants also assert that jurisdiction relating to all

Defendants in their capacity as directors and officers of Parent is lacking because Parent was

not a Delaware corporation.[26]

Plaintiff responds by arguing that he is not relying on Delaware statutes to establish

personal jurisdiction.  Rather, he relies on Federal Rule of Bankruptcy Procedure 7004 and

its nationwide reach.[27]  Plaintiff further asserts that he complied with the requirements under

Bankruptcy Rule 7004, so this Court has personal jurisdiction over Defendants.[28]  Plaintiff

also argues that, to the extent relevant, § 278 limits a dissolved company's ability to sue or

---

[24] Complaint ¶ 14.

[25] Opening Br. 11.

[26] Opening Br. 11.

[27] Answering Br. 5–7.

[28] Answering Br. 5–7.

be sued, but § 279 specifically excludes a trustee or receiver from the three year limitations period.[29]

Personal jurisdiction exists over each Defendant. Personal jurisdiction in bankruptcy court is governed by Bankruptcy Rule 7004(f), which provides:

> If exercising jurisdiction is consistent with the United States Constitution and laws, serving a summons or filing a waiver of service under this Rule 7004 or the applicable provisions of Fed. R. Civ. P. 4 establishes personal jurisdiction over a defendant:
> (1) in a bankruptcy case; or
> (2) in a civil proceeding arising under the Code, or arising in or related to a case under the Code.[30]

Rule 7004(f) thus establishes three prerequisites on a bankruptcy court seeking to exercise personal jurisdiction.[31] First, service of process must have been made upon a defendant pursuant to Bankruptcy Rule 7004 or Civil Rule 4.[32] Second, the bankruptcy court must have subject matter jurisdiction under 28 U.S.C. § 1334.[33] Third, the bankruptcy court's exercise of personal jurisdiction must comport with the Constitution and laws of the United States.[34]

Here, all three requirements are met. First, Plaintiff asserts, and Defendants do not contest, that service was made upon Defendants by mail and through their counsel in

---

[29] Answering Br. 6–7.

[30] Fed. R. Bankr. P. 7004(f).

[31] *Cap. Corp. v. Cote (In re Finova Cap. Corp.)*, 358 B.R. 113, 119 (Bankr. D. Del. 2006) (quoting 10 *Collier on Bankruptcy* § 7004.07 (15th ed. 2006)); *see also* 10 *Collier on Bankruptcy* ¶ 7004.07 (16th ed. 2023).

[32] *Finova Cap. Corp.*, 358 B.R. at 119.

[33] *Id.*

[34] *Id.*

compliance with Bankruptcy Rule 7004(b)(1) and (8).[35]  Second, "related to" jurisdiction

exists.  Third, the exercise of personal jurisdiction over Defendants is consistent with the

Constitution and laws of the United States.  Due process requires only that a defendant

"have certain minimum contacts with [the forum] such that the maintenance of the suit does

not offend 'traditional notions of fair play and substantial justice.'"[36]  Because Bankruptcy

Rule 7004(d) provides for nationwide service of process, and because service of process was

made under that federal law, the forum in question is the United States as a whole rather

than Delaware.[37]  Defendants' contacts with the United States satisfy the *International Shoe*

standard.  As residents of the forum, exercise of personal jurisdiction is proper under the

Constitution and laws of the United States (i.e., there is general jurisdiction over each

Defendant as residents of New Jersey).

Further, I conclude that § 278 of the Delaware General Corporation Law does not

prohibit suit against these Defendants.  Section 278 generally provides that corporations

shall continue to exist for three years after their dissolutions in order to sue and be sued.

Defendants argue that since this lawsuit was filed three years after the forfeiture of Debtor's

charter, the filing comes too late and therefore there is no personal jurisdiction over

Defendants.  Defendants do not attempt to reconcile this state statute with the undeniable

facts that (x) Debtor filed its bankruptcy case and so is under the jurisdiction of this Court

(since prior to the forfeiture of its charter) and (y) they are being sued by the chapter 7

---

[35]  Answering Br. 6; Reply Br. 5.

[36]  *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

[37]  *Finova Cap. Corp.*, 358 B.R. at 119–20.

trustee (not the corporation).  Further, to the extent that it matters, this lawsuit was originally brought within the three year period—when Plaintiff sued Defendants on May 28, 2021 in the Southern District of New York.  Under § 278, such a lawsuit does not abate.[38]

For these reasons, I conclude that personal jurisdiction exists over all Defendants.[39]

## DISCUSSION

### A. PLAINTIFF'S CLAIMS ARE TIMELY.

Defendants next seek to dismiss the Complaint as time barred by Delaware's three year statute of limitations.[40]  Plaintiff counters that this lawsuit is timely under Delaware's savings statute.[41]  Plaintiff is correct.

Defendants contend that "the last possible date upon which Plaintiff could have brought any claims in this proceeding was May 31, 2021."[42]  The complaint in the SDNY Lawsuit ("New York Complaint") was filed on May 28, 2021.  Accordingly, Defendants admit that the New York Complaint was timely filed.  The New York Complaint was dismissed for lack of personal jurisdiction on February 15, 2023.  Plaintiff filed the Complaint here two months later, on April 12, 2023.  The only question, then, is whether the savings statute serves to save the Delaware filing.

---

[38] *See also Marnavi S.P.A. v. Keehan*, 900 F.Supp.2d 377 (D. Del. 2012).

[39] I also note that in connection with their statute of limitations argument, Defendants contend that the Complaint should have been filed in this court in the first instance. *See infra.*

[40] Opening Br. 8 (referring to Del. Code Ann. tit. 10, § 8106).

[41] Answering Br. 7 (citing Del. Code Ann. tit. 10, § 8118).

[42] Opening Br. 8

"It is a well recognized principle that a statute of limitations is not tolled by the filing of a complaint subsequently dismissed without prejudice."[43]  Accordingly, without more, when a complaint is dismissed without prejudice but after the applicable statute of limitations, a plaintiff is foreclosed from further pursuing the action.[44]  But, the Delaware Code contains a savings statute that "reflects [Delaware's] public policy preference for deciding cases on their merits."[45]  The savings statute reads in relevant part:

> If in any action duly commenced within the time limited therefor in this chapter . . . the writ is abated, or the action otherwise avoided or defeated . . . for any matter of form . . . a new action may be commenced, for the same cause of action, at any time within 1 year after the abatement or other determination of the original action, or after the reversal of the judgment therein.[46]

In order for the savings statute to apply, a plaintiff must show that (1) the original complaint was duly commenced and (2) the original complaint was abated or defeated for a matter of form.[47]  An action is duly commenced when a plaintiff "diligently seeks to bring a defendant into court . . . ."[48]  An action is not "duly commenced" where the initial action was intentionally brought in an improper forum.[49]

---

[43] *Cardio-Med. Assocs., Ltd. v. Crozer-Chester Med. Ctr.*, 721 F.2d 68, 77 (3d Cir. 1983).

[44] *Brennan v. Kulick*, 407 F.3d 603, 606 (3d Cir. 2005).

[45] *Reid v. Spazio*, 970 A.2d 176, 180 (Del. 2009).

[46] Del. Code Ann. tit. 10, § 8118(a) (2025).

[47] *Criswell v. McFadden*, No. Civ.A. 05-231, 2006 WL 435717, at *2 (D. Del. Feb. 23, 2006).

[48] *Id.* at *3 (citing *Russell v. Olmedo*, 275 A.2d 249, 250 (Del. 1971)).

[49] *Id.*

Defendants urge that filing in New York was forum shopping, claiming that Plaintiff should have originally brought the claims in this court or in Israel.[50] Plaintiff alleges he filed the original complaint in New York under the good faith belief that New York was an appropriate forum.[51] Defendants do not specifically respond to that assertion.

Defendants' bare assertion of forum shopping, without more, is too thin a reed upon which to rest their argument. While the New York Complaint was dismissed for lack of personal jurisdiction, there is nothing in the opinion to suggest that it was filed there in bad faith or without any argument for proper jurisdiction. Judge Engelmayer ultimately concludes that the governing law provision upon which Plaintiff relied was not up to the task.[52] In doing so, however, he recognized a line of Second Circuit decisions (upon which Trustee relied) enforcing forum selection clauses against non-signatories, but he found that line of cases distinguishable. Thus, I conclude the first prerequisite to the savings statute's applicability is satisfied.[53]

I also determine that the SDNY Lawsuit was dismissed as a "matter of form." Several courts have concluded that lack of personal jurisdiction is a "matter of form" giving rise to the savings statute's grace. In *Cloud*, the Delaware district court held that the "Savings Statute applies to actions initially brought in a foreign jurisdiction and dismissed

---

[50] *See* Reply Br. 4 ("From the outset, Plaintiff could and should have brought Rosetta, Inc.'s claims in this venue, or worked with the Israeli Liquidator to bring all claims in Israel.").

[51] Complaint ¶ 35.

[52] Op. & Ord. at 20-28, *Beskrone v. Berlin*, 1:21-cv-04803 (S.D.N.Y. Feb. 15, 2023), Dkt. No. 84.

[53] *Criswell*, 2006 WL 435717, at *3 (plaintiff's counsel filed the first complaint in good faith based on multiple facts that she believed established jurisdiction; plaintiff's error in bringing her action in the Pennsylvania Court of Common Pleas did not prevent it from being "duly commenced" under the savings statute.).

for reasons other than on the merits of the claim."[54]  There, the plaintiff filed a personal injury suit in Texas, only to have the case dismissed for lack of personal jurisdiction.[55]  The district court reasoned that the purpose of the savings statute is to ameliorate the harshness of the statute of limitations against a plaintiff who promptly brought his action but was defeated by a technicality and concluded that the Delaware savings statute applied.[56]

Reviewing the reasoned decisions, I conclude that dismissal for lack of personal jurisdiction is within the ambit of "any matter of form."  Accordingly, the savings statute granted Plaintiff one year from the original suit's dismissal to commence a new action. Because the SDNY Lawsuit was dismissed on February 23, 2023, and because the Complaint was filed on April 12, 2023, Plaintiff's action is timely.

### B. *THIS COURT CANNOT WITHDRAW THE DISTRICT COURT'S REFERENCE.*

Defendants argue that the reference to the Bankruptcy Court should be withdrawn.[57] Any such request must be made in compliance with Del. Bank. L.R. 5011-1 and is a decision for the district court to make.

### C. *THIS COURT WILL NOT DISMISS FOR* FORUM NON CONVENIENS.

Defendants next implore the Court to dismiss for *forum non conveniens*.  Defendants assert that because they do not live in Delaware, the events did not occur in Delaware and the claims relate in large part to Parent, an Israeli company, Israel would provide a more

---

[54] *Cloud v. Amquip Corp.*, No. Civ.A. 02-1316, 2003 WL 21037653, at *2 (D. Del. Apr. 28, 2003).

[55] *Id.* at *1-2.

[56] *See also Criswell*, 2006 WL 435717, at *1, *3 (Delaware's saving statute saved lawsuit previously dismissed for lack of personal jurisdiction).

[57] Opening Br. 9-10.

appropriate forum.[58]  Defendants argue that Plaintiff's choice of forum is entitled to less

deference because he is asserting claims on behalf of Sabby and the Israeli Liquidator,

neither of whom reside in Delaware.[59]  Defendants also assert that the Delaware-endorsed

factors set forth in *Cryo-Maid, Inc.* support dismissal.[60]

Plaintiff argues that the Delaware bankruptcy court is a convenient forum because

the claims are asserted by a Delaware trustee on behalf of a Delaware debtor's estate.[61]

Plaintiff further states that Defendants are United States residents and that the relevant

actions and business operations did not occur in Israel—Defendants' proposed alternative

forum.[62]  Plaintiff cites to the three-part test articulated by the Third Circuit in *Windt*.[63]

Upon review, the standards are substantially similar.  In *Cryo-Maid*, the Delaware

Supreme Court identified the relevant factors as (1) the relative ease of access to proof;

(2) the availability of compulsory process for witnesses; (3) the ability to view the premises,

if relevant; (4) whether the controversy is dependent upon the application of Delaware law;

and (5) all other practical problems that would make the trial of the case easy, expeditious

---

[58]  Opening Br. 11.

[59]  Opening Br. 11 (first citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 504 (1947); and then citing *Sinochem Int'l Co., Ltd. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007)).

[60]  Opening Br. 12 (citing *Gen. Foods Corp. v. Cryo-Maid, Inc.*, 198 A.2d 681, 684 (Del. 1964)). Defendants do not discuss why this federal court sitting in bankruptcy jurisdiction should look to Delaware state court decisions on *forum non conveniens*.

[61]  Answering Br. 9-10.

[62]  Answering Br. 9-10.

[63]  *Windt v. Qwest Commc'ns Int'l, Inc.*, 529 F.3d 183, 189-90 (3d Cir. 2008).

and inexpensive.[64]  In weighing these factors, courts are directed to dismiss for *forum non conveniens* "only in a rare case" where the defendant establishes "with particularity, that it will be subjected to undue hardship and inconvenience if required to litigate in Delaware . . . ."[65]  The Delaware Supreme Court's undue hardship standard suggests that a plaintiff's choice of forum is entitled to some deference.[66]

In *Windt*, courts are directed to (1) determine whether an adequate alternative forum exists; (2) determine the appropriate amount of deference to give to the plaintiff's choice of forum; and (3) balance the public and private interest factors.[67]  The relevant private interest factors are: (i) the relative ease of access to proof; (ii) the availability of compulsory process for unwilling witnesses; (iii) the cost of attendance for willing witnesses; (iv) the possibility of viewing the premises if relevant; and (v) all other considerations to make the trial easy, expeditious and inexpensive.[68]  Public interest factors to be considered include (i) administrative difficulties from court congestion; (ii) the interest in having local controversies decided at home; (iii) the interest of keeping the action in the location of the applicable law; (iv) the avoidance of unnecessary problems with conflict of laws; and (v) the unfairness of burdening citizens in an unrelated forum with jury duty.[69]  Courts may exercise their discretion and dismiss for *forum non conveniens* if "the chosen forum would

---

[64]  198 A.2d at 683-84 (analogizing the issue of whether to stay an action in favor of a similar action pending in another jurisdiction to the issue of whether to dismiss for *forum non conveniens*.).

[65]  *Chrysler First Bus. Credit Corp. v. 1500 Locust Ltd. P'ship*, 669 A.2d 104, 107 (Del. 1995).

[66]  *Id.*

[67]  529 F.3d at 189-90.

[68]  *Id.* at 189.

[69]  *Id.*

result in oppression or vexation of the defendant out of all proportion to the plaintiff's

convenience . . . ."[70]

Under both standards, the burden rests with Defendants to persuade me that this

Court is an inconvenient forum.[71] And under both standards, I conclude that Defendants

have not met their burden. Plaintiff's choice of forum is entitled to deference. To overcome

this deference, Defendants assert that Parent is an Israeli company, that essential witnesses

are residents of Israel, that most of the relevant documents are in Israel and that Israeli law

applies.[72] Plaintiff counters these arguments, asserting that this action is centered on events

occurring exclusively within the United States by US directors and involving US regulatory

filings and public statements.[73] Plaintiff's assertions are supported by the Complaint.

Defendants do not argue that relevant documents located in Israel could not be transported

by mail or electronically. Thus, the issue of the relative ease of access of evidence—even if

Defendants' contested assertions are believed—does not demonstrate overwhelming

hardship.

Likewise, I am unconvinced that the lack of compulsory process causes

overwhelming hardship. While Defendants assert that "many nonparty officers, directors,

and employees who will be essential witnesses are residents of Israel[,]" Defendants fail to

---

[70] *Id.* at 190.

[71] *GCX Ltd. v. Standard Chartered Bank (In re GCX Ltd.)*, 634 B.R. 441, 449 (Bankr. D. Del. 2021); *Chrysler First*, 669 A.2d at 107.

[72] Opening Br. 12.

[73] Answering Br. 3.

demonstrate the need for compulsory process given that these are Defendants' witnesses.[74] As to the law to be applied, Defendants contend that Israeli law mirrors Delaware law on the law of fiduciary duties.[75] The applicable law to the other counts is not contested.

Further, Plaintiff is a Delaware trustee and Defendants are residents of New Jersey. Delaware is certainly closer and more convenient for Defendants than Israel. Additionally, Parent maintained an office in Pennsylvania.[76]

Finally, I note that Defendants argue that "Plaintiff could and should have brought [Debtor's] claims in this venue . . . ."[77] They are thus hard pressed to make a *forum non conveniens* argument.

This forum does not "result in oppression or vexation of the defendant out of all proportion to the plaintiff's convenience." The motion is denied on this ground.

### D. FAILURE TO STATE A CLAIM.

With the preliminaries out of the way, Defendants move to dismiss for failure to state a claim. The briefing, however, is not as crisp as it could be for at least two reasons. First, Defendants begin their briefing by devoting five pages to a discussion of the documents they believe are in Plaintiff's possession and what they believe those documents show. While that might be appropriate in the summary judgment context (where Defendants could append those documents to an affidavit so that they could be considered

---

[74] Opening Br. 12.

[75] Opening Br. at 28 ("Israeli law mirrors Delaware law on the breach of fiduciary duty . . . .").

[76] Reply Br. 6.

[77] Reply Br. 4.

by the court), they do not bear on a motion to dismiss.[78]  Second, because, as Defendants rightly point out, Plaintiff did not specify which fiduciaries duty(ies) Defendants purportedly breached, Defendants are forced to guess.  Defendants thus spend most of their time briefing the duty of oversight (*Caremark*).  In his answering brief, however, Plaintiff disavows that theory and states that Defendants have pleaded the duty of care and loyalty.  Notwithstanding, instead of addressing the duties of care and loyalty, most of Defendants' reply brief focuses on the duty of oversight.  I will not address Defendants' oversight arguments as Plaintiff insists he is not bring a *Caremark* claim, and Plaintiff will be so limited going forward.  Further, I will address only those arguments made germane to a motion to dismiss based on failure to state a claim.[79]

Generally speaking, notice pleading is the standard for complaints filed in Federal court.  The cases Defendants cite that are based on Chancery Court decisions are therefore inapposite.[80]

      *1. Count I (Breach of Fiduciary Duty/Debtor).*

With respect to Count I, Defendants make only a few arguments.  First, Defendants argue that Berlin is protected by an exculpation provision in Debtor's charter and that

---

[78] *See Stanziale v. Nachtomi (In re Tower Air, Inc.),* 416 F.3d 229, 238 (3d Cir. 2005) (where "a defendant's motion to dismiss articulates the plaintiff's claims that supposedly lack factual support" dismissal is not appropriate.  "To hold otherwise would be effectively to transform Rule 12(b)(6) motions into multi-purpose summary judgment vehicles.  That we will not do.").

[79] Even in the *Caremark* portion of brief, Defendants argue the merits of the claims, not the pleading standard.

[80] *Tower Air,* 416 F.3d at 236-37 (discussing difference between Civil Rule 8 and Chancery Court Rule 8 and ruling that the District Court erred in equating federal notice pleading decisions with Delaware notice pleading decisions).

Plaintiff cannot overcome the existence of that provision.[81]  The existence of an exculpation provision is irrelevant, however, because an exculpatory provision is an affirmative defense not properly considered at the motion to dismiss stage unless Plaintiff alleges the business judgment rule in his complaint.[82]

Second, Defendants argue (perhaps with respect to both Berlin and Kalfus) that the business judgment rule protects Defendants' acts.[83]  Again, the business judgment rule is a defense to a plaintiff's allegations so it is not properly considered on a motion to dismiss.[84]

Third, Defendants raise, but do not develop, an argument that under "established Delaware law" a wholly owned subsidiary operates for the benefit of its parent such that "Berlin and Kalfus, in their capacities as a director and an officer of [Debtor], respectively, could exercise no control over the contents of [Parent's] public filings or agreements."[85] While couched in "oversight" language, Plaintiff responds by acknowledging the distinction between duties owed by wholly owned subsidiaries depending on solvency.  Plaintiff alleges he has pleaded insolvency during all relevant periods and cites to multiple paragraphs in the Complaint.

In the Complaint, Plaintiff alleges facts that show:

- At the § 341 meeting, Kalfus testified that Debtor did not operate profitably in "the years prior to the Petition Date and was insolvent."  "To address its financial condition, the Debtor pursued a number of options, including sale or merger with other companies."

---

[81] Opening Br. 19.

[82] *See Tower Air*, 416 F.3d at 242; *Carickhoff v. Cantor (In re Live Well Fin., Inc.)*, Adv. Pro. No. 21-50990, 2023 WL 4025816, at *3 n.19 (Bankr. D. Del. June 14, 2023) (collecting cases).

[83] Opening Br. 20.

[84] *Tower Air*, 416 F.3d at 238.

[85] Opening Br. 24.

- "The Debtor's insolvency in the years prior to the Petition Date was such that its Schedules and Statements show assets of $696,396.42."

- The Claims register shows $53,667,345.75 in claims against Debtor.

- In 2017, Reveal was responsible for 75%-85% of Debtor's revenues.

- Reveal tests were falsely coded from "Day One" such that revenues from Reveal tests were significantly inflated.

- Parent's April 5, 2018 Form 6-K shows a deteriorating financial condition and the possibility of needing to seek protection under the bankruptcy laws.

While, admittedly, Plaintiff could have alleged more financial details, taking all inferences in his favor, Plaintiff has pleaded that Debtor was insolvent during all relevant time periods. In particular, I note Kalfus's own testimony, under oath, at the § 341 meeting that Debtor was insolvent for the years prior to the petition date. Because, for purposes of this motion to dismiss, Debtors are insolvent, Berlin and Kalfus have a fiduciary duty to Debtor. Thus, Plaintiff's claim based on Debtor's causes of action against Berlin and Kalfus will not be dismissed on the basis that Plaintiff failed to state a claim.

On the other hand, Count I will be dismissed as to Sabby's claims against Berlin and Kalfus on that ground. In Count I, Plaintiff, bringing creditor Sabby's direct claim, alleges that Berlin and Kalfus breached the fiduciary duties they owed to Debtor and its creditors. As Defendants rightly argue, creditors of an insolvent entity "have no right, as a matter of

law, to assert direct claims for breach of fiduciary duty against the corporation's directors."[86] That is, even if a corporation is insolvent, Sabby has no direct claim.[87]

### 2. Count III (Breach of Fiduciary Duty / Parent).

In Count III, Plaintiff asserts Parent's claims for breach of fiduciary duty against its own directors and officers: Berlin, as CEO and President, Kalfus as CFO and Markison as Chair of the Board of Directors. Defendants make two arguments in addition to those already rejected above. First, they argue that Plaintiff's allegations are conclusory and second, they argue that there are no specific allegations that the Genoptix stockholder vote was not informed.

As to the first, my review of the Complaint differs from Defendants'. Plaintiff's allegations are sufficiently concrete for Defendants to understand the nature of the allegations against them. As to the second, Defendants fall back to the business judgment rule with respect to the interestedness of Defendants in the stockholder vote. As already concluded, the business judgment rule is a defense, not addressed at this stage of the case.

---

[86] *N. Am. Cath. Educ. Programming Found. Inc. v. Gheewalla*, 930 A.2d 92, 94 (Del. 2007). *See* Opening Br. 29. As the Delaware Supreme Court explained

> It is well established that the directors owe their fiduciary obligations to the corporation and its shareholders. While shareholders rely on directors acting as fiduciaries to protect their interests, creditors are afforded protection through contractual agreements, fraud and fraudulent conveyance law, implied covenants of good faith and fair dealing, bankruptcy law, general commercial law and other sources of creditor rights. . . . "[T]he general rule is that directors do not owe creditors duties beyond the relevant contractual terms."

*Id.* at 99 (quoting *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 787 (Del. Ch. 1992).

[87] Further, there is no need for Sabby to assert any derivative claim because Plaintiff asserts Debtor's claims on its own behalf.

### 3. Counts II and IV (Gross Negligence).

Defendants' one paragraph argument with respect to Counts II and IV is:

> Counts Two and Four of the Complaint alleges [sic] gross negligence claims by [Debtor] against Berlin and Kalfus, and by [Parent] against all Defendants, respectively. While these [are] denominated as claims for 'gross negligence,' under Delaware law, such claims are interpreted as claims for breach of the duty of care, as gross negligence is the standard for breach. As set forth above, Plaintiff fails [to] state a claim for breach of the duty of care, and thus, gross negligence.[88]

As set forth above, Defendants' only basis for their failure to state a claim for breach of the duty of care argument is an exculpation clause. Because Defendants equate gross negligence with the duty of care, relief on Counts II and IV is denied.

### 4. Counts V and VI (Fraud).

Defendants' one paragraph argument with respect to Counts V and VI is:

> Counts Five and Six of the Complaint allege fraud claims by [Debtor] and [Parent] against all Defendants. The conclusory allegations focus on allegedly-fraudulent statements and omissions to third-parties such as (a) to commercial payors and Medicare (Complaint ¶149); (b) to creditors and investors (id.); (c) to Genoptix (id.); and (d) to Sabby (Complaint ¶ 150). The claims do not allege any different wrongs than were alleged in Counts One and Three, alleging breach of fiduciary duty, and they also fail to state a claim and should be dismissed.

Defendants equate the fraud claims with the breach of fiduciary duty claims. As those have survived the motion to dismiss, the fraud claims do as well.

### 5. Count VII (Negligent Misrepresentation).

Defendants' one paragraph argument with respect to Count VII is:

> In Count Seven of the Complaint, [Parent] alleges misrepresentation against all Defendants. Each of the allegations therein, however, is characterized as a breach of the duty of care, and should be dismissed.

For the same reasons, Count VII will not be dismissed.

---

[88] Opening Br. 30.

**CONCLUSION**

For the reasons stated above, the Motion is DENIED except with respect to the

claim in Count 1 asserted on the Sabby-assigned claims.  A separate order will enter.

Dated: July 14, 2025

Laurie Selber Silverstein
United States Bankruptcy Judge